Comstock, J.
The bank, it appears, was in want of money, and Mr. Lynch, its cashier and chief financial officer, proposed to borrow, upon the certificate of deposit now in question, and several others of a like character. The certificates were executed by him, as cashier, in the usual form, and an agent was employed by him to go to New York and negotiate them for cash in behalf of the bank. Without stating details, the plan was carried into effect. The plaintiff, in New York, advanced on the particular certificate in question the sum of $4,850, upon *156 an understanding that he was not to present it to the bank for payment in less than thirty days. - The sum advanced was some $80 less than the face of the certificate, after making due allowance for -interest and- exchange. The amount was. placed by the agent with Duncan, Sherman & Co., the correspondents of the bank- in New York, where it was subject to the order of the bank,- or would be applied in reducing the balance then due to those correspondents. Such was the transaction, according to -its professed and ostensible character; and, so far,- there is- no dispute about the facts.
The first questions presented are, whether the bank had power to borrow the money, and whether the cashier was a proper agent to execute that power without any special delegation of authority thus to act. That the power to borrow existed, was determined by this court, upon the fullest examination, .in . the case of Curtis v. Leavitt (15 N. Y., 9). That the cashier, in virtue of his general employment, could:exercise the power, was. not denied upon the argument, and the proposition does not admit of a reasonable doubt.
In the next place, if the bank could borrow money, it could .execute - and deliver an assurance or undertaking for the payment of the sum loaned in any form not forbidden by'the terms or just interpretation of- some statute of this State. This was also settled in the case above mentioned. There is no pretence that .these certificates of deposit, payable, as they were, on demand, fall within any of the restraints imposed by law upon the banking institutions of the State. They were therefore valid instruments, so far as any question of corporate -power-to. issue them is concerned.
Conceding, however^ that such instruments could be lawfully issued, it is .nevertheless denied that the certificates now in question were -executed by the proper agents, so as to make them obligatory upon the bank. The 21st section of the general banking act (Laws of 1838, 250) provides-that “contracts made by any such association, and all notes and bills-by them issued and put in circulation as.money, shall -be signed by the president or vice-president and cashier thereof.” Certificates *157 of deposit, it is claimed, are contracts, and, in order to have any validity, must be signed by the president or vice-president as well as cashier.. I have no doubt that they are contracts,' not only according to the general interpretation of that term, but within the meaning of the statute referred to. In a case, therefore, where the president or cashier of one of these associations has no powers delegated to him, either in the articles of association or in the by-laws, by particular appointment or by usage and custom in the bank, it may be that the signature of one of them to a contract, without the other, will not bind the institution. It is not probable that such cases are frequent amongst the banking associations of this State; but we can conceive of an instance where there is a total absence of all delegated power, except such as may be implied in being chosen to fill one of those offices. If the statute is to be taken as excluding all possible modes of executing contracts except the one specified, it can be applied only to such a case. Where the association itself confers no authority in any mode of delegation—in other words, where the power of the agent to act is derived from the statute alone—the particular agents who can act are pointed out; and it may, for the sake of argument, be conceded, that the power is vested in them to the exclusion of others. The Legislature, in authorizing the formation of banking associations, were calling into existence .a class of artificial beings, of which there had been no example in this State. These existences were partnerships, or associations, with certain attributes of corporations, such as the right to a common seal, the power of perpetual succession, &c. It was deemed necessary, therefore, or at least wise and proper, to point out a mode of executing contracts so as to render them binding on all the associates. This was done in the 21st section, by designating the president and cashier ■ as the agents who were to sign them.
But there is nothing in the terms of this provision which necessarily deprives the association itself of the right to enlarge the powers of those agents, or to appoint others to make.contracts on its behalf. Whatever a natural person can do in *158 dealing with, others, he can appoint any agent to do. So, all acts within the powers of a corporation may be performed by agents of its own selection. If associated banks form an exception to this principle, it is, I think, an anomaly nowhere else to be found in the statute or the common law. It is usual for the associates in these banking institutions to vest all their powers irrevocably in a board of directois, to be annually chosen. That this can be lawfully done, has never been, and I think ought not to be, doubted. If, then, the whole board of directors should enter into an agreement for the purchase of land for a banking-house, would that agreement be void for want of the cashier’s signature ? If written proposals should be made to one of these associations to build a banking-house, and the board should, by resolution, accept the proposals and enter into the contract, would not that be a binding obligation? Again, if the board should, by resolution, delegate, either to the president or cashier, or to a committee, the power and duty of employing a teller, and of entering into a written contract for the services required, and a contract should be made accordingly, would it be unauthorized and void ? It is said that the cashier cannot, alone, enter into any species of written contract. But suppose the board of directors should afterwards, by unanimous resolution, adopt and ratify it, the question arises, have they, or have they not, the power to do so, and thus to make the agreement binding on the association ? I do not entertain a doubt that, in all these instances, the exercise of power would be regular, and the association bound by the agreement. The error which leads to the opposite conclusion is in supposing that the association can only bind itself by the particular agents named in the statute—a construction which virtually vests in them all the powers of the corporate body— I because no written agreement can be entered into without their i consent. Indeed, either one of them, acting alone, holds an absolute negative over the proceedings of the entire body. A cashier, having, as is often the case, no interest or stock, may frustrate the will of every associate by refusing to sign his name. This, I am persuaded, is not the true construction of *159 the statute. Where the associates have not lodged the power elsewhere; where the matter is to be determined upon the statute alone, without any action of the artificial body, contracts within the scope of its general powers must be signed by the president or vice-president and cashier, as the statutory agents. But the statute was not designed as an appointment of particular agents, to the exclusion of all right in the corporate or associate body itself to appoint other agents to do lawful acts and enter into lawful contracts.
. A different conclusion must lead to results both mischievous and absurd. As banking is carried on in this State, it is often if not generally the case that the president takes no part in the ordinary and daily routine of business. Contracts and engagements are entered into every day by the cashiers and tellers, amounting, without doubt, to many millions of dollars. A customer, who deposits money, requires a certificate or a draft or a check to be certified. These are all contracts. A certificate is a promissory note; a draft is nothing else than a bill of exchange; and the usual certification written upon a customer's check is equivalent to an acceptance and undertaking to pay, on which the bank is liable. (Farmers' and Mechanics' Bank v. Butchers' and Drovers' Bank, 16 N. Y., 125.) If they are not contracts within the meaning of the statute, then the certificate now in question is not one, and the objection, that it is not signed by the president, of course falls to the ground. But they are undoubtedly contracts, within every possible definition of the term, and they are made in the daily business of every bank, without the signature of the president. The signature of the cashier or teller is sufficient to render them valid obligations, because those agents derive their authority from the association, and their acts thus become the acts of the association. So, in the present case, it is proved to have been a custom in the bank for the cashier, without the president, to / sign and is^ue certificates of deposit. Such a custom could [ not have been unknown to the board of directors. The cash- \ ' ier, therefore, in issuing such instruments, acted under their authority, and, in so doing, he wielded the power of the corpo- ) *160 ration itself; The corporation, therefore, cannot be permitted to repudiate these obligations, on-the mere ground that-they were not duly executed.
! ■ In - considering the question so far I have - not noticed the- : case of Safford v. Wyckoff, President, &c. (4 Hill, 442.) In that case the action was upon a bill of exchange- drawn- by-the cashier of a-banking association, without the signature ■ of the-president--or vice-president. -The Supreme Court had-decided that the action could not be maintained, on the ground-that the'corporation had no power to issue negotiable -instruments except circulating notes- countersigned-by-the Comptroller. (1 Hill, 11.) In the Court of Errors that question was examined, as well as the one whether the bank' could be bound by the signature of the cashier only. The judgment was reversed, and both questions were ne'cessarily determined-in-the plaintiff's -favor. ' I do not concur in all the reasoning-which led tb that result,- but the point now under consideration was fully considered and was decided. That decision has nevér been departed from; -and, I think, never questioned in-any other- case. - It was a determination of the-court of last resort, and has entered very largely into the business and dealings of the community with the banks of this State, If-we now disregard it, we shall jeopardize many interests- and endanger many contracts.
- Passing, then; these questions of power-and regularity, it only remains to consider whether there was error at the trial-in respect to any other ground of defence. . On the trial the certificate appears to have been regarded, by. the defendant; as an instrument falsely declaring that money had been deposited in "the'bank, and, on that ground, as fraudulent and void in the hands of "Mr. Hollister, to whom it was delivered by the cashier.' This fraud being assumed, it was claimed that the plaintiff, in order to entitle himself to recover, must prove that he took the certificate in good faith and for value. These views have been also urged upon the argument in this court. But this' defence rests upon a confused and illogical notion of the real "nature of the case. It assumes that the certificate *161 was issued without consideration, and therefore fraudulently, to be held by Hollister, as an obligation against the bank, and to be negotiated, if at all, for the benefit of himself or of some confederate in the fraud. This is a misconception of the facts. The certificate was not intended to be an operative instrument in the hands of Hollister. On the contrary, it was signed and placed in his possession, as an agent of the bank, to be delivered by him to such person as would advance money thereon for the benefit of the institution. The plaintiff was that person, and in his hands it first became a valid security. Until then it was not a delivered instrument, and could not be a fraudulent one. When he advanced the money, that very money became the consideration on which alone the obligation rested. As there could be no fraud in such a transaction, the proposition urged at the trial, that the plaintiff must prove himself a bona fide holder, was properly overruled. Ho question of good faith arises when a borrower delivers his own note to a lender, as an assurance for the payment of the loan. Hor does the interposition of an agent between the dealers alter the nature of the transaction.
There is only one possible view of the case in which a question of fraud could arise. The transaction was ostensibly, and was in fact, a loan of money to the bank, and the money was placed within its control by being put to its credit on the books of its correspondents in Hew York. The cashier, as an individual, had, thus far, nothing to do with the transaction. It is inferable however, from the evidence, that he was in the habit of fraudulently using the funds of the bank; and it may be true that, while borrowing this very money in the name and professedly for the benefit of his institution, he intended to appropriate it to his own private use. Assuming this fact, he intended to commit a fraud upon his principal, and the plaintiff advancing the money with notice of such a design, would be a participator in the wrong. I do not infer from the bill of exceptions that the defendant relied at all upon this view of the case. The judge, however, charged in general terms, that if the cashier made and issued the certifi *162 cate with, intent to defraud the bank, and the plaintiff received it with notice of that fact, the verdict should be for the defendant. In my opinion this instruction was all that the case called for. The fraud, if there was any of the kind now supposed, rested in the mere intention of the cashier, and so far as we know, was confined to his own breast. Was the plaintiff bound to produce affirmative evidence that he had no knowledge of this fraudulent design ? I am clearly of opinion that he was not. The fact was to him entirely inaccessible. It could only be inferred from a knowledge of the fraudulent practices in which the cashier was engaged; but those had not yet become known to the president and directors engaged in the management of the same institution. The plaintiff resided some two hundred and forty miles distant, and was a stranger not only to the bank but to its cashier. He had no right or opportunity to examine the books of the one, or to become acquainted with the dealings of the other. It was, perhaps, unusual for the certificate of á country bank to be offered in Hew York at a discount, with a request that it should not be presented for payment in thirty days. Conceding this, and giving full force to the circumstances, the only result is that the plaintiff should have inquired into the origin of the instrument. We will assume that he did so inquire. That inquiry conducted him to the precise facts, and he ascertained that, the bank being in want of money, the cashier proposed to borrow it, and for that purpose made and issued the certificate on which he, the plaintiff, was asked to make the advance for thirty days. Ho possible inquiry could lead him to a knowledge of the cashier’s imputed design to embezzle the I funds. It is indeed a new doctrine that a person, having dealt with an agent who is acting within his acknowledged ' powers, must prove that he did not know of the agent's design I to abuse his trust by appropriating to his own use the pro- ( ceeds of the dealing. If such a doctrine cannot be maintained, as clearly it cannot, then there is no error of which the defendant can complain in the present case.
The judgment should be affirmed.
*163 Albeit, «L, also delivered an opinion for affirmance, differing from the preceding in no material respect except that upon the question of the validity of the certificate, notwithstanding its execution by the cashier only, the learned judge expressed himself as follows:
Albeit, J. The first objection taken in this case is, that the plaintiff recovered upon the certificate as a contract, and that it is not a contract obligatory on the defendant.
It is conceded that the defendant is a corporation created by virtue of the general banking law of 1838 (ch. 260, § 7), and the defendant contends that the certificate is not its contract, inasmuch as it is not executed by the banking corporation or association. The 21st section of the act referred to declares that “ contracts made by any association, and all notes and bills by them issued and put in circulation as money, shall be signed by the president or vice-president and cashier thereof.” The certificate here was signed by no other officer than the cashier, and the defendant’s counsel insists that no recovery can, therefore, be had upon it in the hands of an innocent holder for value paid.
There can be no doubt of the correctness of the general position assumed by the counsel, that a corporation or association, created by the statute, derives all its power from the act creating it, and that where its mode of action is prescribed, this mode must be strictly complied with by its officers and agents to render contracts obligatory upon it. The authorities are abundant to this point, and need no particular comment. (Beatty v. Marine Insurance Company, 2 John., 108; Hosack v. College of Physicians, 5 Wend., 547, 552; People v. Utica Insurance Company, 15 John., 358; Ang. & Ames on Corp., 278, 279 ; 2 Kent Com., 177; Head v. Providence Insurance Company, 2 Cranch, 127, 166-169; Bank of United States v. Dandridge, 12 Wheat., 64; Bank of Augusta v. Earle, 13 Peters, 519; McCullough v. Moss, 5 Denio, 567.) But this rule is subject to certain qualifications and exceptions, some of which will be hereafter noticed, so far as they are applicable to the present case.
*164 " The first question now is, whether the certificate, the amount of which is sought to be recovered, is a contract within the fair meaning and construction of section 21, just cited. And here it is proper to inquire, in the first place, whether this question has not been already passed upon and decided by the court of highest resort in the State, .and if it has, whether the present, acting in no higher capacity, can or ought to disturb a decision upon which the commercial and banking community have based their action for the last thirteen years. In the case of Safford v. Wyckoff, President of the Farmers' Bank of Seneca County (4 Hill, 442), the Court of Errors decided that a negotiable draft or bill of exchange in the ordinary form, though issued by an association organized under the general banking law, without the sanction of the Comptroller, will bind the association as in favor of a bona fide indorsee; and this notwithstanding it be signed by the cashier only; that it must be presumed to have been legally issued until the contrary appear. The court say—Senator Hopkins delivering the opinion (p. 445)—that it is true the 21st section enacts that all contracts, notes and bills by them issued and put in •circulation as money, shall be signed by the president or vice-president and cashier, but it leaves the inference that there might be other bills and notes, not issued for circulation as money, that might be payable elsewhere than at the office of the bank issuing them, and might be signed otherwise than is prescribed for paper to be issued for such circulation.
If a bank had a right to draw a draft- for any purpose - (as it clearly had), the abuse of the right should not prejudice an innocent holder.
“The term ‘contract’ is ordinarily applied to agreements where both parties become obligated. If the word ‘contract’ was intended to include all paper, why was it followed by the clause specifying notes and bills issued for circulation ? I do not think the provision was intended to apply to drafts or bills, not intended for circulation as money, drawn in the ordinary Course of banking business, for transferring the funds of the-bank. If the bank had purchased a bill of exchange, or draft *165 payable to its order, which it wished to sell again, as it has a right to do, is it reasonable to suppose that it must be indorsed by both president and cashier? And, yet, the indorsing is as much a contract as the drawing of a bill.
“ So, also, with respect to certificates of deposit. Such a construction of the law would subject the banks to unnecessary inconvenience and expense. The provision being expressly made applicable to bills and notes issued for circulation as money, leaves the inference that bills of exchange and negotiable paper not intended for such purpose may be issued without the signature of the president or vice-president. ”
The opinion of Senator Hopkins was concurred in by Senator Bockee, and a majority of the members of the court.
It was said, upon the argument, that the decision in this case was by a small majority, against the opinions of Chancellor Walworth and Senator Paige, and ought not to be binding upon the present court. It is true, that Chancellor WALworth did dissent from the conclusions to which the majority arrived. But, in delivering his opinion, he concedes that the section does not, in fact, include a class of contracts that are never, in fact, made by the association, but which arise by operation of law merely, as in the ordinary case of an implied assumpsit to repay moneys deposited with the bank. “ In such case,” he says, “ the certificate of the cashier or teller, or the entry in the pass-book of the customer, is not a contract; it is only evidence of a fact, which might be proved by parol, to raise an implied promise by operation of law.” And Senator Paige, who delivered an opinion in that case, in accordance with the views of the Chancellor, remarks, in his opinion in Curtis v. Leavitt (15 N. Y., 222), that the opinions of Senators Hopkins and Bockee, in Safford v. Wyckoff, especially since the decision of this court in James v. Patten (2 Seld., 15, 16), must be presumed to have been adopted by a majority of the court, and must be regarded as conclusive—upon the principle of stare decisis. It appears to me, therefore, that the point which we are discussing has been well settled by the decision of the highest State court; and, to use the words of one of our breth *166 ren in Towle v. Forney (14 N. Y., 429), “we cannot do otherwise than follow it.”
But, conceding the question to he open, we are not without authority to support the views expressed in Safford v. Wyckoff upon similar statutes elsewhere enacted. A bank charter provided that ali bills, bonds, notes, and every other contract or engagement on behalf of the corporation, should be signed by the president and countersigned by the cashier, “ and that the funds of the corporation should in no case be liable for any contract or engagement, unless the same be signed and countersigned as aforesaid.” The clause was held to apply only to express contracts, and not to extend to undertakings implied in law; and, accordingly, the bank was made liable on a check signed only by the cashier. The court said: “ It was to le hoped that the argument was not intended to reach the case of a deposit of money; and yet, if it proved anything, it proved that no contract in law could be imputed-to the bank; that a check, or certificate, was not properly a bond, bill or note, but an acquittance. So, a certificate was only evidence of a deposit with the bank, and with the proper officer who was accustomed to receive such deposits, and deliver an acknowledgment or acquittance thereof.” (Mechanics' Bank v. Bank of Columbia, 5 Wheat., 326; Ang. & Ames, on Corp., 280.)
It is necessarily one of the incidental powers of a cashier or teller to issue certificates of this kind under the 18th section, which confers upon the institution the general powers of banking by discounting bills and by receiving deposits, which is a method of borrowing; and the bank might “undoubtedly give a proper certificate as evidence of the deposit, ” as was well remarked by one of the judges in delivering his opinion in Curtis v. Leavitt (15 N. Y., 269), and he well adds, “this act might, perhaps, be fairly considered as a necessary incident of the power expressly conferred.”
The whole business of a bank is confided, in the first instance, to a board of directors, and they usually confer the power to transact its most important and daily financial operations to their cashier and teller. The cashier is usually *167 intrusted with all the funds of a bank. He receives directly all moneys and notes. He delivers up all discounted notes on payment. He draws checks and drafts, and in short is the executive officer, through whom and by whom the whole moneyed operations of the bank, in paying or receiving debts or discharging them, is to be conducted. It is his duty to apply the negotiable funds, as well as the money of the bank, to the payment of its debts. In receiving deposits did the Legislature ever contemplate that the depositor must wait for the president or vice-president to sign with the cashier a mere certificate or acknowledgment of the receipt of the money by the cashier ? The answer to this question is, to me, plain and conclusive. The power to receive must be a power to acknowledge the reception; and one follows as a necessary incident of the other.
It has been held in Illinois and North Carolina, under similar statutes, that the receipt of the cashier alone is evidence of a deposit so as to charge the bank. (State Bank v. Kain, 1 Breese, Ill., 45; State Bank v. Locke, 4 Dev., N. C., 533.)
It is argued by the defendant’s counsel, that this is the case of' an express contract, and that the instrument was sought to be recovered upon as such, and that, although the provision may not extend to obligations implied by law where the defendant would be liable on an implied contract for moneys deposited with it; yet where an express contract made by the corporation and not created by operation of law is relied on, it must be made in the mode prescribed by statute. To this it may be answered: First. That the complaint does n'ot set out a contract unless the very terms of the certificate make it such. It merely avers the making and transfer of the certificate by which the defendant certified (or acknowledged), through its cashier, the receipt of $5,000 on deposit by F. Hollister to his credit, and demands payment. It has already, I think, been satisfactorily shown that the certificate is merely evidence of the fact of deposit, and that the cashier or teller had the power to issue such receipt or certificate. There can be no doubt but that the money, if deposited, *168 could hav.e. been recovered .either with or without such certificate. • All the cases—and the counsel—agree in this. But it is said, in the present case, no money was actually deposited. What difference .does that make, s.o far as an innocent purchaser. of the certificate for value is concerned? He has a right to presume that a certificate, signed by a-bank officer in his official character, is correct; and to act accordingly. If he acts with : knowledge or. under circumstances so suspicious as to require him to put himself on his guard, the question is then presented under a different aspect. • But until then a Iona fide holder is in the same - position as an innocent depositor, who could recover his money without any certificate at all, on parol proof of the deposit.
. 2, And this leads, us very naturally to another view of this subject, and that is:
. Supposing that the act of issuing the.certificate alone, was not authorized by the act of 1838, and that it falls within the provisions of. section 21. The certificate was a negotiable instrument: such,an one as the bank, through the cashier ^nd teller, and most frequently through the latter, had been in the daily habit of issuing, and their acts were daily recognized by the president and directors in' their official intercourse with the bank. A book for the names .of- depositors and the amounts and certificates thus issued was kept, and although it appears from that book that no entry of this particular certificate was made, yet that does not concern a holder-for value, who is not supposed to know of the delinquencies or neglect of bank officers, as among themselves or within the walls of their own building.
It is sufficient for a purchaser for value, without notice, that the certificate is fair upon its face; and the law protects him in his rights. It was not for the purchaser in this case to inquire, in the absence of all circumstances calling for such inquiry, whether the money had been actually deposited or not; nor does it seem to be required by good faith or justice, on the part of the defendant, as the evidence shows that the whole amount of the proceeds of the certificate was deposited *169 to the credit of the plaintiff, deducting the amount which the parties agreed upon at the time of the sale. If the section extended to such paper, it was undoubtedly for the benefit and protection of the bank; and if it sees fit to waive a formality, and dispense with the signature of any other officer to the certificate of a deposit, it may do so; and the strongest proof of confidence in the integrity of a cashier or teller is the intrusting him, or them, with all the moneyed transactions of the bank, and holding them out to the world as fit agents to be intrusted, by receiving and paying, from time to time, their certificates of deposit.
Such is the practice of all banks at the present day, so far as my information extends. I know of no case, occurring in all the numerous banks of this State, where these instruments are executed in any other form than the one we are now considering.- They are negotiated and acted , upon in good faith every day; ■ and the institutions issuing them should be-bound ■by their contents, except in cases of fraud. They-are, -probably, thus issued upon the principle of stare decisis, established, as I have remarked, in Safford v. Wyckoff; but, whether so or not, millions of property are constantly afloat in the shape of these certificates, which the banks ought riot to be permitted to repudiate,-and thus take advantage of their own wrong, even: against an innocent third party.
If any bank chooses to depart from its general course of business, it is, without doubt, at liberty to do so; but, in such case, it is incumbent on it to show that it has interposed a restriction, and that it is known to those with whom it.is in the habit of doing business.
The -remainder of the learned judge’s opinion corresponded so nearly to that of Comstock, J., as to render a further report of it unnecessary.
Johnson, Ch. J., did riot sit in the case; Strong, J;, put his judgment upon the grounds stated by Allen, J.; Denio and Grover, Js., dissented,
Judgment affirmed.